(No. 78127.—Affirmed.)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. COREY BATCHELOR, Appellant.

*Opinion filed March 21, 1996.*

Rita A. Fry, Public Defender, of Chicago (Andrea

Monsees, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Peter D. Fischer, Kenneth T. McCurry, Susan Schierl and Owen D. Kalt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

In a bench trial in the circuit court of Cook County, the defendant, Corey Batchelor, was found guilty of first degree murder, armed robbery, and burglary on a theory of accountability and sentenced to concurrent terms of imprisonment of 30 years on the conviction of first degree murder and 10 years on each of the other two convictions. Rejecting defendant's claim that the evidence was insufficient to sustain these convictions, the appellate court affirmed (No. 1—92—1125 (unpublished order under Supreme Court Rule 23)). We allowed defendant's petition for leave to appeal (155 Ill. 2d R. 315). We affirm.

The evidence at trial revealed that the victim, 69-year-old Lula Mae Woods, had transacted business at her bank on the afternoon of her death on June 1, 1989, depositing $254 and receiving $100 in cash. Shortly thereafter, at approximately 2:15 p.m., her neighbor, Barbara Neal, saw the victim's feet "hanging out" of the victim's garage, which was located four doors down an alley. Neal approached, saw the victim on the garage floor with blood on her chest, and returned to her own home, where she called 911 for help. Police found the door of the garage open and the victim lying in the garage with her head against a wall behind a vehicle with the trunk open. The victim had no pulse and was warm

to the touch. A length of strap from a black purse and a set of car keys were found in a pool of blood near one of the victim's feet. The victim was lying on a blue and white pizza cap bearing the Domino's logo on the top. The victim's black purse, missing part of its strap, was found in a garbage can nearby at about 3:30 or 3:45 p.m. Police recovered no currency from the purse. About two feet away, on the sidewalk near the garbage can, police found the victim's bankbook. On the ground beside the bankbook were several of the victim's deposit slips. Between approximately 3:35 and 4 p.m., police found a knife lying on the sidewalk in the alley leading out of the area of the garage. The cause of the victim's death was multiple stab wounds. Two of the three stab wounds on the body were deep and penetrating, one penetrating a lung and the aorta, the other penetrating the liver. The size of the knife recovered near the scene as well as the nature of its blade were consistent with the wounds found on the victim's body.

Also admitted into evidence was a court-reported statement defendant gave on June 7, 1989, in response to questions by an assistant State's Attorney. Defendant said that as he was walking alone on the afternoon of June 1, 1989, he saw Kevin Bailey, who asked defendant what he was "about to do." After defendant told Bailey that he was about to walk up toward the store, Bailey said, "[L]et's go make a little money." When defendant asked, "[D]oing what?" Bailey responded, "[S]natch a purse and run." The two continued to walk together. Defendant described their conversation: "And I was like get out of here. And he's like I am serious. So I was ignoring him, but I was still telling him to get out of here." They reached the alley behind the victim's house, located at 9310 South Union Street in Chicago.

As they walked past the alley, Bailey said, "Look." Defendant looked back and saw Bailey, who had fallen

four or five feet behind him, turn and walk into the alley. As Bailey walked down the alley, defendant saw him "go in his back pocket" and pull out and put on a blue and white pizza hat. Upon putting on the hat, Bailey turned around and looked at defendant and told him to "come on." Defendant looked past Bailey's shoulder and could see "this lady" in "the garage." By the time defendant "turned around and was turning in the alley," Bailey was in the garage. Defendant could, he said, see Bailey in the "tip" of the garage and "could hear this lady saying help, and I was right next to the garage." He saw Bailey pulling "the bag." Defendant did not, however, go into the garage.

"After I heard the lady saying help," defendant stated, "and she started, it was getting real loud, and I started panicking, and I just turned around. And I was about to start walking out the alley real fast." As defendant got to the "very tip" of the alley, he turned and could see Bailey "like down on his knees or something." Defendant could see Bailey's leg "sticking out" of the garage door and could tell "by the way he was laid, he was bent down or laying down" on the garage floor. Defendant "stopped to see what was going on. Then the next thing I know, I seen him take the hat, he didn't have the hat, he had the hat in his hand. And he had his hand on the hat. But then when I looked and there was a squad car going past Halsted, and I was going to tell him there is a squad car going past Halsted." Defendant said, "I was telling him they [the police] were down there, and he better get away from the garage." When the defendant turned around and looked, the hat was gone. Bailey came out of the garage "[a]fter he had already got the bag" and "[s]tarted trotting down an alley. And then I thought he was going to come around and meet me right there." However, Bailey went in a different direction.

Defendant saw Bailey next when defendant "went back to 92nd and Wallace." Bailey, who was not carrying a weapon, started sprinting down Wallace and ran up to defendant, who asked, "[W]here is the bag or purse, or something. I said bag or purse, that you had in your hand. And he said I just stashed it." When defendant asked him where he had stashed it, Bailey said, "[A]round the corner." "We had got to walking down 92nd Street," defendant stated, "and then when we got down to Emerald, we turned to see if the police was still down there." After a "good 30 or 40 minutes" Bailey and defendant went to retrieve the purse, which Bailey said he had put in an alley. Bailey obtained the purse, and defendant saw him "going through" it for money, which he found. Then defendant saw Bailey stuff the purse into a garbage can. When Bailey "came back down to the end of the alley, he had some money." Bailey told defendant the amount of money was $80, "but," defendant said, "I think it was more than that." Defendant asked Bailey for $10. "And he [Bailey] was like, you could take half of it. And so when he said half, he took out two $20's, and he gave me two $20's." In the statement defendant said that no one had threatened him in any way so that he would give the statement and that he had been treated well by the police while in their custody.

The defendant testified in his own behalf that he had made up this statement from information given to him by the police. He said he had done so after a police officer kicked and choked him and struck his head against a wall. He indicated that police sought a statement implicating Bailey: "All I had to do was tell them something against Calvin [sic] Bailey because he was already was [sic] trying to implicate me into the case, and that they said that they knew he had something—been involved in the case, but they didn't believe that I had

something to do with the case, that's what Officer Keo (Phonetic) told me." One of the police officers threatened to kill him or to beat him, defendant said, "so bad I wish I was dead." On cross-examination defendant testified, "The officers just told me to give them anything to take into court against Calvin [*sic*] Bailey." He denied having seen Bailey at all on June 1, 1989, and having seen Bailey take a purse from a woman on that date.

In ruling the circuit court stated, "The Court considers that the evidence in this case does not establish that the defendant was a principal. The evidence in this case does establish that he was accountable as accomplice." The court observed that the defendant's statement established that defendant was with Bailey before and after the incident and was in his presence during it. The court considered "that there was discussion about making some money and snatching a purse. The incident in this case involved a snatching of a purse, and the effort of snatching of a purse resulted in the killing of the victim in order to complete the undertaking." Of defendant's statement the circuit court stated further,

> "The defendant has given a statement which does not establish that he did any stabbing and indicates, however, that he was mindful of what was going on before and during the time it was happening, and that he was there to help. His statement, which he, himself, gave[,] so indicates."

The circuit court concluded that defendant's statement, together with the circumstantial evidence concerning the offenses, established his guilt under a theory of accountability. Denying the defendant's post-trial motion, the circuit court said that it had considered defendant's statement and "considered there were parts of the statement which made sense and parts of the statement which the court did not consider to conform to the facts in the case."

Defendant takes the position that the circuit court

determined that he did not act as Bailey's lookout during the commission of the armed robbery and that his participation was limited to assisting Bailey escape from the scene of a completed offense. Defendant reaches this conclusion by reasoning that because the court found he was not a principal and because, under the common law, a lookout was a principal in the second degree, since a lookout was deemed to have a constructive presence at the scene of an offense, "the only basis left on which to pin the accountability determination was [defendant's] relation to *** Bailey's 'escape' and its sequelae." Defendant argues, *inter alia*, that it would violate the purpose and policy of the Criminal Code of 1961 (720 ILCS 5/1—1 *et seq.* (West 1994)) to engraft onto the law of accountability the "escape" rule of felony murder. He suggests that his criminal liability is limited to that for concealing or aiding a fugitive (720 ILCS 5/31—5 (West 1994)). The State responds that the facts of this case do not present the issue of whether one who merely aids in the escape of a criminal from the scene of a completed offense can be held accountable for the offense of the criminal; instead, the State urges, these facts show that defendant did not assist only during Bailey's escape but knowingly participated by acting as Bailey's lookout throughout the commission of the offense.

Under Illinois law a person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c); *People v. Taylor*, 164 Ill. 2d 131, 140 (1995); *People v. Reid*, 136 Ill. 2d 27, 60 (1990). The mere presence of a defendant at the scene of a crime, even when the defendant knows that a crime is

being committed, is insufficient, without more, to establish accountability. *Taylor*, 164 Ill. 2d at 140; *Reid*, 136 Ill. 2d at 61. However, active participation has never been a requirement for imposing criminal liability under a theory of accountability; that is, one may aid and abet without actively participating in the overt act. *Taylor*, 164 Ill. 2d at 140. An accused may be deemed accountable for acts performed by another pursuant to a common plan or purpose. *People v. Furby*, 138 Ill. 2d 434, 456 (1990). Words of agreement are unnecessary to establish a common purpose, or design, to commit a crime, which can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *Taylor*, 164 Ill. 2d at 141. In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene. *Taylor*, 164 Ill. 2d at 141.

Upon review we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Kitchen*, 159 Ill. 2d 1, 25 (1994). The reviewing court must consider that the circuit court heard and saw the witnesses and, thus, was in the better position to judge their credibility, to determine the weight to be accorded their testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in it. *Reid*, 136 Ill. 2d at 61. The credibility of a defendant's confession is to be weighed by the trier of fact, which may accept all, parts, or none of the confession. *People v. Pecoraro*, 144 Ill. 2d 1, 11 (1991); *People v. DiGerlando*, 30 Ill. 2d 544, 551 (1964). Where a defendant's statement is contradicted by the facts and

circumstantial evidence, the trier of fact need not believe it, even though other witnesses do not contradict the statement directly. *People v. Warren*, 33 Ill. 2d 168, 174 (1965).

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the defendant accountable for the acts of Bailey. The evidence supports the conclusion of the circuit court that defendant was in Bailey's presence during the incident as well as the determination of the appellate court that defendant had knowledge of Bailey's criminal purpose "from the beginning." We agree with the appellate court's observation that defendant "assisted in the commission of the offense by acting as a lookout and sounding an alarm that the police were in the area." We note that defendant warned Bailey of the approach of police despite seeing the victim struggle with him and hearing the victim's repeated and increasingly more audible cries for help. Defendant fled the scene, did not report the incident, and met with Bailey after the offenses were committed, inquiring as to the whereabouts of the victim's purse and receiving part of the cash taken from it. As it is permitted to do, the circuit court expressly rejected part of defendant's court-reported statement. A rational trier of fact could well have believed that defendant's conduct as described in this statement, particularly insofar as it is corroborated by circumstantial evidence, belies his exculpatory claim that he did not believe Bailey when the latter proposed that they "snatch a purse and run." We agree with the appellate court's further observation that "[d]efendant turned and followed Bailey into the alley even though he saw that Bailey, after having suggested a robbery, was headed toward a lone woman in a garage while attempting to conceal his appearance." In short, the evidence supports the findings of the circuit court

that defendant was "mindful of what was going on before and during the time it was happening, and that he was there to help." Inasmuch as the circuit court could, and apparently did, find that a common criminal purpose existed before and during the commission of these offenses, we do not address the defendant's contentions arising out of his claim that his participation was limited to assisting Bailey escape from the scene of a completed offense.

For the reasons stated, we affirm the judgment of the appellate court.

*Affirmed.*