(No. 86557.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HOWARD WILEY, Appellant.

*Opinion filed October 25, 2001.*

214

KILBRIDE, J., concurring in part and dissenting in part.
HARRISON, C.J., dissenting.
THOMAS, J., joined by McMORROW, J., also dissenting.

Martin Carlson, of the Office of the State Appellate Defender, and James Geis, both of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and

Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a trial in the circuit court of Cook County, a jury convicted defendant, Howard Wiley, of three counts of murder and armed robbery. Defendant waived his right to a jury for the ensuing capital sentencing hearing, and the circuit court sentenced him to death on the murder counts. The circuit court also sentenced defendant to consecutive 30-year sentences for the armed robbery convictions. Defendant appealed, and this court remanded the cause with directions to conduct further proceedings under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). *People v. Wiley*, 156 Ill. 2d 464 (1993) (*Wiley I*). After the circuit court concluded that the State had not violated the principles enunciated in *Batson*, the cause returned to this court for further review, and this court affirmed the convictions and death sentence. *People v. Wiley*, 165 Ill. 2d 259 (1995) (*Wiley II*). The United States Supreme Court subsequently denied defendant's petition for writ of *certiorari*. *Wiley v. Illinois*, 516 U.S. 923, 133 L. Ed. 2d 223, 116 S. Ct. 322 (1995).

Defendant thereafter filed a petition, which was later amended and supplemented, for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994)). The circuit court dismissed the petition without an evidentiary hearing, and this appeal followed. 134 Ill. 2d R. 651. On November 16, 2000, this court issued an opinion affirming the circuit court's order of dismissal. Defendant filed a petition for rehearing (155 Ill. 2d R. 367), which this court allowed on January 29, 2001. Both parties have submitted further briefing

materials in accordance with the order of this court. For the reasons that follow, we affirm in part, reverse in part, and remand the matter for an evidentiary hearing.

## BACKGROUND

The testimony presented at trial was recounted by this court in *Wiley II*, 165 Ill. 2d at 267-71, and we will detail here only those facts relevant to our resolution of this appeal. On approximately December 2, 1985,[1] Donna Rucks, Carla Williams, and Adrienne Parham were murdered in Rucks' apartment. Their bodies were discovered on the morning of December 3 by employees of the building where the apartment was located, and the police were summoned. All three deaths were the result of gunshot wounds to the head. The subsequent police investigation led to defendant's arrest. Defendant was ultimately tried, convicted, and sentenced to death for the crimes.

After the completion of the direct appeal proceedings, defendant filed a petition for post-conviction relief. The petition was improperly denied, and this court reinstated defendant's petition. Defendant filed an amended post-conviction petition and later filed a supplement to that petition. The State then moved to dismiss.

The trial court dismissed defendant's post-conviction petition without a hearing, stating both that the petition was untimely and that the petition did not necessitate an evidentiary hearing. Additional facts will be supplied, where necessary, in our analysis.

## ANALYSIS

On appeal, defendant maintains that the circuit court's order must be reversed because the circuit court erred in finding that the petition was time-barred. Defendant also maintains that the circuit court's alterna-

---

[1]This date was misstated in our previous opinions as December 2, *1986*. See *Wiley I*, 156 Ill. 2d at 467; *Wiley II*, 165 Ill. 2d at 267.

tive ruling—that the issues raised did not warrant an evidentiary hearing—was improper.

We begin by noting that a post-conviction action is a collateral attack on a prior conviction and sentence. *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995); *People v. Free*, 122 Ill. 2d 367, 377 (1988). As such, the remedy "is not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994). The scope of the proceeding is limited to constitutional matters that were not, and could not have been, previously adjudicated. Any issues which could have been raised on direct appeal, but were not, are procedurally defaulted (*People v. Ruiz*, 132 Ill. 2d 1, 9 (1989)) and any issues which have previously been decided by a reviewing court are barred by the doctrine of *res judicata* (*People v. Silagy*, 116 Ill. 2d 357, 365 (1987)).

In addition to these procedural bars, a defendant is not entitled to an evidentiary hearing unless the allegations set forth in the petition, as supported by the trial record or accompanying affidavits, make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). In making that determination, all well-pleaded facts in the petition and affidavits are to be taken as true, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. *Coleman*, 183 Ill. 2d at 381. The dismissal of a post-conviction petition is warranted only when the petition's allegations of fact—liberally construed in favor of the petitioner and in light of the original trial record—fail to make a substantial showing of a constitutional violation. *Coleman*, 183 Ill. 2d at 382. On appeal, the circuit court's decision to dismiss the petition without an evidentiary hearing is subject to plenary review. *Coleman*, 183 Ill. 2d at 388.

Timeliness of the Petition

We note the State concedes that the circuit court

improperly dismissed, as untimely, defendant's post-conviction action. After reviewing the record, we agree and accept the State's concession. Therefore, we turn to defendant's other assertions of error.

### Sufficiency of the Death Eligibility Verdict

Defendant maintains that his appellate counsel was ineffective for failing to argue that the evidence was insufficient to prove him eligible for the death penalty beyond a reasonable doubt. This court has held that this type of claim is cognizable under the Post-Conviction Hearing Act. See *People v. West*, 187 Ill. 2d 418, 434-35 (1999). Such a claim is measured against the same standard as those dealing with ineffective assistance of trial counsel. See *West*, 187 Ill. 2d at 435 (and cases cited therein). A defendant who contends that appellate counsel rendered ineffective assistance must show that the failure to raise the issue was objectively unreasonable and that the decision prejudiced the defendant. *West*, 187 Ill. 2d at 435. In other words, we must determine whether appellate counsel would have presented a successful challenge to the sufficiency of the evidence with respect to defendant's death eligibility on direct review, had he raised the claim at that time.

A defendant can be found eligible for the death penalty only if the finder of fact finds that the State has proven beyond a reasonable doubt that defendant was at least 18 years of age at the time of the commission of the offense and that at least one statutory aggravating factor exists. Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(f), (g). In this case, defendant's death eligibility was predicated upon the statutory aggravating factor set out in section 9—1(b)(6) of the Criminal Code of 1961.

At the time of defendant's trial, section 9—1(b)(6) authorized the imposition of the death penalty when the murdered individual was killed in the course of another felony "if: (a) the murdered individual: (1) was actually

killed by the defendant, or (ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable *** and the physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(a). The section also required that the defendant acted with the intent to kill the murdered individual or with knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b). During the eligibility phase of the death sentencing hearing, the State must prove all of the elements of the aggravating factor beyond a reasonable doubt. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(f).

Defendant waived his right to a jury for sentencing. At the eligibility phase of the hearing, the State presented a certified copy of defendant's birth certificate as proof that defendant was over the age of 18, and the parties stipulated that defendant was born on June 7, 1946. The parties also stipulated to the trial testimony, the trial exhibits, and the special verdicts of the jury, which found that defendant was guilty of murder and of armed robbery and that defendant "performed the acts which caused the death" of each victim. No other evidence was introduced. The court found defendant eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6), now 720 ILCS 5/9—1(b)(6) (West 2000)) because he had committed the murders knowingly or intentionally and in the course of another felony. The court declined to find defendant eligible under any other factor.

According to defendant, the eligibility finding in this case is constitutionally deficient because the State never

proved that defendant's conduct fell within the class of culpable conduct which would warrant the imposition of the death penalty. Defendant contends that there is simply no proof that his conduct was within the ambit of section 9—1(b)(6) because the evidence does not reflect that he actually murdered the victims or that he inflicted physical injuries upon the victims in the manner required by the statute. Defendant points out that his confession, relied upon by the State during the guilt phase of the trial, coupled with the rest of the evidence presented by the State, proves only guilt of felony murder or guilt on the basis of accountability. Stated differently, defendant argues that there is no evidence of record which supports the inference that he actually killed the victims or that he inflicted injuries substantially contemporaneously with physical injuries caused by one or more persons for whose conduct defendant is legally accountable, as is required under the felony-murder aggravating factor. Thus, the crux of defendant's ineffective assistance of counsel claim is that the evidence was insufficient to support the circuit court's finding of death eligibility.

In light of defendant's contentions, the State argues that the evidence presented at trial was sufficient to find that defendant committed the murders. The State points out that the trier of fact was entitled to reject the self-serving portions of defendant's confession on the basis of the circumstantial evidence which supported the inference that defendant acted alone in committing the murders.

In addressing this claim, we must necessarily review the evidence adduced at trial because both the State and defendant, at the eligibility phase of the hearing, stipulated to that evidence. In addition, the trial judge, sitting as the trier of fact at sentencing, referred specifically to the evidence at trial when he found defendant eligible for the death penalty under section 9—1(b)(6).

The evidence presented at the guilt phase of defendant's trial revealed the following. One of the victims, Donna Rucks, normally worked a morning shift at a hotel near the murder scene. A coworker became concerned when Rucks failed to report for work on the morning of December 3, 1985. The coworker went to Rucks' apartment and asked the building manager to enter the apartment. The building manager went to get the passkey to the apartment, but the key would not work. Police eventually were called to the scene, and it was decided that a window would be broken by the building maintenance man in order to gain access to Rucks' apartment.

The maintenance man broke the window and entered into the apartment's living room. There he saw two bodies and smelled something burning. Police instructed him to open the front door. The front door had two types of locks on it—one attached to the doorknob and a dead bolt. The door was both locked and dead-bolted. The door could be locked from the inside of the apartment by throwing the dead bolt. The door could be dead-bolted from the outside only by the use of a key.

While police were investigating the crime scene, the phone in the apartment rang. After answering the phone call, police went to the home of defendant's father. There, they spoke with defendant, who told them that he knew the victims, was concerned about them, and would be happy to help with the police investigation. Defendant agreed to accompany them to the police station.

At the station, defendant acknowledged to Detective Ptak that he had been at Rucks' apartment on December 2, and that he had become concerned when no one answered his knocks on the door. Defendant said that he had called the police, but that the officers who had responded to his call refused to break into the apartment because it looked secure from the outside.

Defendant further revealed to Ptak that he had

spoken to his parole officer. Ptak then consulted with the parole officer. Ptak subsequently resumed his interview with defendant and advised him of his *Miranda* rights. After having waived his rights, defendant changed his story. Defendant admitted that he had been at Rucks' apartment around 10 a.m. on December 2. He knocked on the door, and it suddenly swung open. He entered the apartment and saw the bodies of Rucks and Parham on the living room floor. He then went upstairs and found Carla Williams' body. All of the victims were dead. Defendant then left the apartment and closed the door, realizing that the door would lock behind him. He did not call police because he was afraid that he would be blamed for the murders since he was on parole. At that point, Detective Ptak informed defendant that one of the victims, Carla Williams, had been raped. Defendant told Ptak that he "kn[e]w" that Williams had not been raped, and the detective asked defendant how he could have known that. Police arrested defendant at that point for the murder of the three victims.

Subsequent to the arrest, Detective Ptak learned that defendant might have fired a weapon, a few days earlier, at a grocery store located in the vicinity of the murder scene. Ptak went to the store and recovered a bullet that was embedded in a cooler. Ptak was told that defendant had fired the shot into the cooler. The recovered bullet was submitted for ballistics study and was later discovered to match those recovered from the bodies of the victims. Chicago police detectives Rochowicz and Vallandingham later spoke with defendant, after advising him again of his *Miranda* rights. When confronted with the ballistics evidence, defendant stated that he "needed time to think." He later agreed to give an account of what had occurred at Rucks' apartment.

Defendant told Detective Rochowicz that on December 2, he telephoned Carla Williams, who was "holding"

$5,000 for him. Defendant told her that he needed the money because he was broke, but Williams responded that he would have to wait for it. Defendant become angry and then went to a pool hall, where he met a man he knew by the names of Eddie Jones and Charles Battles (hereafter Battles). Defendant told Battles about the money and offered to pay him $1,500 if Battles would help him recover the money. Battles agreed, and the men drove to the victims' apartment. Defendant gave Battles a .38 revolver that defendant had with him.

Defendant maintained that he and Battles planned to stage a phony "stickup." To that end, defendant knocked on the door and was let in by one of the victims. Defendant left the door slightly ajar so that Battles could enter behind him. According to defendant's confession, Battles came into the apartment and announced a "stickup." Battles, however, became startled when one of the victims, Rucks, jumped up from a couch, and he shot her. At this time, the second victim, Parham, started to run away, and Battles shot her, too. The third victim, Williams, then came down the stairs from an upper-floor bedroom. When she saw what had happened, she ran back up the stairs. Battles ran after her, and shot her. Defendant stated that he heard a shot, but did not know what happened because he did not follow Battles up the stairs. After the shooting stopped, Battles told defendant that he "better be with" Battles, and defendant agreed. Defendant stated that he left the apartment at that time, but that Battles stayed behind.

After giving this verbal account to detectives, defendant gave both oral and written statements to assistant State's Attorney Michael Gerber. These later statements were substantially similar to the account defendant gave Detective Rochowicz.

Apart from defendant's statement, the State also presented expert testimony regarding the specific charac-

teristics of the bullets found in the bodies of the victims. Two eyewitnesses also testified that they saw defendant, on November 26, 1985, shoot a weapon in a store and that the bullet fired from the gun struck and became embedded in a cooler. Forensic evidence revealed that the bullets from the victims' bodies shared the same characteristics as that found in the store. The State also presented detailed testimony from the medical examiner who performed the autopsies of the victims. Each victim was killed by a gunshot wound to the head.

Defendant did not present any evidence on his behalf. The jury found defendant guilty of three counts of first degree murder and three counts of armed robbery.

As noted previously, the crux of defendant's ineffective-assistance claim is that the evidence of death eligibility is insufficient to support the trial judge's finding. The standard of review to be applied is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish defendant's eligibility for the death penalty beyond a reasonable doubt. *People v. Pasch*, 152 Ill. 2d 133, 213-14 (1992). In so doing, a reviewing court must consider that the circuit court heard and saw the witnesses and, thus, was in a better position to judge their credibility, to determine the weight to be accorded their testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in it. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). The credibility of a defendant's confession is to be weighed by the trier of fact, which may accept all, parts, or none of the confession. *People v. Pecoraro*, 144 Ill. 2d 1, 11 (1991); *People v. DiGerlando*, 30 Ill. 2d 544, 551 (1964). Where a defendant's statement is contradicted by the facts and circumstantial evidence, the trier of fact need not believe it, even though other witnesses do not contradict the statement directly. *Batchelor*, 171

Ill. 2d at 376-77; *People v. Warren*, 33 Ill. 2d 168, 174 (1965).

We have thoroughly reviewed the evidence presented at trial and the arguments made by the parties in these proceedings. After careful consideration, we must conclude that the State proved defendant's death eligibility under section 9—1(b)(6) beyond a reasonable doubt. Although we agree with defendant that, in his confession, he denied actually killing the victims or inflicting injuries on the victims in the manner required by section 9—1(b)(6), the trier of fact, as noted above, is not bound to accept a confession in its entirety. Indeed, the trier of fact may accept the damaging admissions and discredit the exculpatory assertions in the confession. Any discrepancy between defendant's confession and the evidence is for the trier of fact to consider in assessing the degree of credibility to afford the confession. *People v. Hester*, 39 Ill. 2d 489, 511 (1968), *overruled on other grounds*, *People v. Anderson*, 113 Ill. 2d 1 (1986). Thus, in this case, the sentencing judge, sitting as the trier of fact, had the right to discard defendant's assertion that it was Battles who had fired all of the fatal shots. After reviewing the evidence in its entirety, we believe that this finding was supported by the evidence, as we detail below.

Although we acknowledge the closeness of the evidence, we focus on several facts which we feel a trier of fact may have found compelling. Critically, the evidence revealed that defendant continually changed his story to the police investigators. Defendant told several stories to the police regarding his knowledge of the events which transpired at Rucks' apartment. His version of the events changed each time police confronted him with independent evidence indicating that defendant was lying to them. As a result, the trier of fact may have believed the central feature of defendant's confession, that the killings took place during the course of a felony,

but disbelieved the self-serving portions in which defendant placed blame for the actual killings on Battles. We note that defendant's confession was corroborated in some respects by his detailed knowledge of the scene of the crime. Moreover, the physical and forensic evidence also contradicted some of the more self-serving portions of that confession. For example, the circuit judge at sentencing aptly described the murders as "executions," and our review of the forensic and physical evidence supports that conclusion much more than it supports the frenzied, spur-of-the-moment description of the shootings that defendant attributes to Battles. The medical examiner testified that Rucks' body bore traces of stippling, which indicated that she was shot at very close range. This testimony tends to contradict defendant's statement that Battles shot Rucks when she was startled by his entrance into the apartment. The medical examiner's testimony established that Williams' body not only bore gunshot wounds, but wounds around her neck. Defendant initially told police that he had seen Williams' body in the upstairs bedroom and had touched her neck in order to see if she had a pulse. In defendant's confession, he stated that he did not go upstairs at all and did not see Battles shoot Williams. This tends to support the inference that defendant knew facts about the condition of Williams' body that only her killer would have known. In our view, the inculpatory parts of defendant's confession were corroborated by sufficient evidence to support the judge's finding that defendant was death eligible under section 9—1(b)(6). Further, we believe that the judge's *sub silentio* determination to reject the self-serving portions of the confession is not so manifestly unreasonable as to be subject to reversal upon review.

In view of the foregoing, had appellate counsel challenged the sufficiency of the evidence with respect to the court's finding of death eligibility on direct appeal, the

challenge would not have been successful; accordingly, defendant's ineffective assistance of appellate counsel claim must fail. See *West*, 187 Ill. 2d at 435. The circuit court, therefore, did not err in dismissing this claim.

Ineffective Assistance of Trial Counsel

Defendant next contends that his trial counsel was ineffective for failing to buttress his contention that the evidence was insufficient to prove defendant eligible for the death penalty. Defendant maintains that trial counsel should have used two police reports to corroborate defendant's contention that he was not the last person to leave Rucks' apartment.

In determining whether a defendant has been denied effective assistance of trial counsel, Illinois courts adhere to the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). In order to establish ineffective assistance of counsel, a defendant must first demonstrate that his defense counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Secondly, a defendant must demonstrate that, but for defense counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. Courts, however, may resolve ineffectiveness claims under the two-part *Strickland* test

by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance. See *People v. Erickson,* 161 Ill. 2d 82, 90 (1994); *Albanese,* 104 Ill. 2d at 525-27.

Even if this court were to assume that counsel's decision not to use the police reports was incompetent, we do not believe that defendant could establish the requisite prejudice. The police reports reveal that an acquaintance of one of the victims called the apartment on December 2 between the hours of 10 and 11:45 a.m. The caller spoke with Rucks at 10 a.m., but could not get through later. Taking the affidavit as true, as we must, we still do not believe that this evidence, if presented to the trier of fact, would have been sufficient to instill reasonable doubt as to defendant's death eligibility. The evidence, in and of itself, does not tend to prove or disprove the central fact in contention, whether defendant was the actual killer of the three victims.

Defendant also points to another police report that contains observations that, at the time the police entered the apartment, they found food smoldering in a pot on the stove and the television turned on. We fail to see how this evidence would have supported a finding that Battles killed the victims and not defendant. At most, the police report corroborates the evidence that was presented at trial, *i.e.,* that the victims were in the middle of a routine day when they were set upon by their killer. Again, the evidence, in and of itself, does not tend to prove or disprove the central fact in contention, whether defendant was the actual killer of the three victims. Accordingly, we cannot say that the circuit court erred in dismissing this claim.

### Ineffective Assistance of Counsel During Aggravation/Mitigation

Defendant next asserts that he was denied the effective assistance of counsel at sentencing because trial

counsel failed to investigate potential sources of mitigation and failed to present the evidence that such an investigation would have uncovered. Specifically, defendant claims that trial counsel failed to discuss any mitigation strategy with him and that counsel knew that defendant suffered from extreme emotional and mental distress at the time of the offense. Defendant also claims that his trial counsel failed to contact several family members who would have provided testimony more favorable than that of the witness counsel did subpoena.

We begin our review of this issue by recounting the evidence adduced during the aggravation/mitigation phase of the capital sentencing hearing. The State introduced evidence of defendant's criminal history, which dated back to 1964, when defendant was convicted of aggravated battery. Defendant was subsequently convicted of attempted robbery, burglary, unlawful use of weapons, robbery, aggravated battery/armed violence, and unlawful use of weapons. The State also presented evidence that while defendant was in the county jail, awaiting trial on the charges at issue in this case, he received four disciplinary violations.

In mitigation, defendant presented the stipulated testimony of Lt. Robert Kelly, a Cook County department of corrections officer. Kelly would have testified, if called, that he was employed by Cook County as a correctional officer at the county jail, the facility where defendant had been jailed for the past year. Defendant manned the food wagon, delivering food to the other inmates. Defendant also mopped the floors. Defendant performed these duties well and did not pose a threat to jail staff or inmates.

The defense also presented the stipulated testimony of Cheryl Winke, a psychologist with the Department of Corrections. Winke, if called to testify, would have stated that she examined defendant and found that defendant

had a "beta I.Q. of 103." Moreover, it was Winke's opinion that defendant appeared "spontaneously aggressive" rather than "criminally oriented." Defendant did not exhibit any psychopathology and appeared to function within the normal range of intelligence.

A report by another correctional officer, L.A. Jones, was also submitted to the circuit court as evidence in mitigation. The summary, dated in 1981, revealed that defendant was recommended for meritorious good time by the food service director for satisfactory work performed. A memorandum, dated June 26, 1981, also noted that defendant had returned keys that another inmate had given to him. Defendant told prison officials that he did not want to become involved. Defendant also won a trophy for weight lifting.

Harold Anderson testified on defendant's behalf. Anderson stated that he knew defendant personally for 11 years and had worked with him at a shoe store for four years. Anderson first met defendant at the state penitentiary, while they were both incarcerated. He knew defendant to be a "happy-go-lucky" person who "always kept things alive." Anderson did not believe that defendant had drug or alcohol problems.

Defense counsel also called defendant's stepbrother, Jerry, as a witness. Jerry was a reluctant witness whose testimony was compelled by subpoena. Jerry stated that their mother took care of both Jerry and defendant as "best she could" and was a "good mom." Jerry admitted that defendant was a "good" brother, but stated that defendant was "not his role model." Jerry did not approve of defendant's friends. Jerry also stated that he knew that defendant took drugs, but that he never personally saw defendant ingest drugs. When defendant was sober, Jerry felt that he could discuss things with him, but when defendant "was other than sober," defendant would "get upset" and would be "pretty wild."

In one instance, defendant pulled a knife on him. Jerry knew of defendant's past criminal history and stated that there "come[s] a time when you just blanked out because you don't want to continue hearing about it."

The circuit court, in sentencing defendant to death, noted that "the best that can be said" for the defendant was that defendant (i) helped a fellow convict find a job, (ii) earned statutory good time while incarcerated, and (iii) won a weight-lifting contest while in prison. The circuit court also observed that, although defendant had family living in the Chicago area, the only family member who testified was his stepbrother, Jerry. Moreover, with respect to Jerry's testimony, the court stated that "the State could not have found a better witness than Jerry Wiley if they wrote the script themselves." Specifically, the court noted the following:

> "This defendant has turned on everyone. He pulls a knife on his family, he shoots, beats and mauls the public, establishing a criminal record of repeated violent conduct, he robs and kills his friends ***.
>
> I believe the defendant Wiley is possessed of an abandoned and malignant heart and spirit and this Court finds no redeeming mitigating factor in this case."

The circuit court thereafter sentenced defendant to death.

As with alleged claims of ineffectiveness occurring during the guilt phase of the trial, the standard for determining whether a defendant has received constitutionally deficient representation at a capital sentencing hearing is governed by the standard enunciated in *Strickland*. As such, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, absent the errors, the judge " 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *People v. Henderson*, 171 Ill. 2d 124, 145 (1996), quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

As noted, defendant claims that his attorney failed to discuss mitigation strategy with him and that, as a result, counsel did not call witnesses who were available and willing to testify on his behalf. These witnesses include defendant's daughter, Gwen Jones; his stepsister, Rosie Rhodes; and his sister, Juanita Jones. The affidavits of each of these women indicate that they would have testified that defendant was a good person, who had an exemplary employment history. They would have stated that defendant was a good relation, but that he had a strained relationship with his stepfather. Defendant also points out that counsel should have adduced evidence of the history of mental illness that runs through defendant's family. Further, counsel knew, or should have known, that defendant was psychologically impaired, and, as a result, should have had defendant examined by experts. In support of these allegations, defendant attached to his petition various documents that he claims to have recovered from his case file with the Cook County public defender's office. These documents indicate that defendant may have been suffering from psychological disorders at the time of the murders. Defendant also supported his petition with the evaluations of mental health experts, secured by post-conviction counsel, which would corroborate the prior diagnoses of head trauma and neurological disorders.

It is well settled that counsel has a duty to make reasonable investigations for potential sources of mitigating evidence to present at the capital sentencing hearing, or must have a legitimate reason for failing to make a particular investigation. See *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Howery*, 178 Ill. 2d 1, 55 (1997); *People v. Orange*, 168 Ill. 2d 138, 170 (1995); *People v. Ruiz*, 132 Ill. 2d 1, 27 (1989). If mitigating evidence exists, counsel then has a duty to introduce it in support of the defense. See *Kubat v.*

*Thieret*, 867 F.2d 351, 369 (7th Cir. 1989). However, where counsel has conducted an adequate investigation, the failure to present mitigating evidence does not by itself demonstrate deficient performance. See *Howery*, 178 Ill. 2d at 55; *People v. Ruiz*, 177 Ill. 2d 368, 385 (1997); *Orange*, 168 Ill. 2d at 167-68.

Generally, courts are highly deferential in reviewing counsel's strategic decisions regarding the presentation of mitigating evidence. See *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065; *Orange*, 168 Ill. 2d at 170. In fact, strategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. See *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. An informed decision by counsel not to present certain mitigating evidence may represent a valid strategic choice and is entitled to judicial deference, where the evidence is potentially damaging to the defendant. See *Burger v. Kemp*, 483 U.S. 776, 793-95, 97 L. Ed. 2d 638, 656-57, 107 S. Ct. 3114, 3125-26 (1987); *Ruiz*, 177 Ill. 2d at 385. Such deference is not warranted, however, where the lack of mitigating evidence presented is not attributable to strategy, but rather is the result of counsel's failure to properly investigate mitigation and prepare a defense. See *Howery*, 178 Ill. 2d at 56; *Orange*, 168 Ill. 2d at 170. Consequently, counsel's presentation of mitigation is not deemed to be a legitimate strategy without a reasonable investigation into mitigating circumstances. See *Ruiz*, 177 Ill. 2d at 385; see also *Hall v. Washington*, 106 F.3d 743, 749-50 (7th Cir. 1997).

In our view, defendant's petition and supporting affidavits make a substantial showing that defense counsel's limited presentation of mitigating evidence at the sentencing hearing was not the result of a strategic decision preceded by a reasonable investigation. The record before this court contains no evidence that allows us to

conclude that counsel's decision not to present additional mitigating evidence was a strategic decision. We acknowledge that when the drawbacks of potential mitigating evidence appear obvious from the record, it can be assumed that counsel decided not to present evidence for such reasons. See *Ruiz*, 132 Ill. 2d at 26. Here, however, there appears to be no obvious disadvantage in the additional mitigating evidence. On this record, we reject the State's claim that trial counsel's failure to present the additional mitigating evidence was a strategic decision.

The mitigating evidence offered by trial counsel at the sentencing hearing portrayed defendant as someone who had good parents, but who fell in with a bad crowd and got entangled in drugs and alcohol abuse. Information regarding defendant's need for psychiatric counseling and history of mental illness might have provided the sentencing judge with additional information that could have influenced the choice of sentence. See *People v. Perez*, 148 Ill. 2d 168, 188-89 (1992) (the State's theory that counsel reasonably declined to introduce school reports at the sentencing hearing because they contained aggravating evidence that the defendant was a "troublemaker" was not reasonable strategy where counsel did introduce a psychological report at sentencing which portrayed the defendant as much worse than a "troublemaker"). Moreover, the record before us reveals no attempt by counsel to secure the testimony of any member of defendant's family other than his stepbrother, Jerry. The affidavits of the family members here reveal that they were willing to come and provide mitigating evidence on defendant's behalf. Given the record before us, we decline to assume that defense counsel's alleged failure to present the additional mitigating evidence represented a legitimate strategic decision.

Having considered the performance prong of the

*Strickland* standard, we must further examine whether defendant has made a substantial showing that he was prejudiced by counsel's alleged deficient performance. In establishing prejudice, defendant must show that there is a reasonable probability that, absent counsel's deficient performance, the sentencer would have concluded that the balance of aggravating and mitigating factors did not warrant death. See *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. We note that, in the past, this court has held that despite the violent nature of the offenses and the fact that a defendant had been convicted of multiple murders, counsel's failure to investigate and present mitigating evidence so prejudiced the defendant as to warrant an evidentiary hearing. See *Orange*, 168 Ill. 2d at 173; *People v. Thompkins*, 161 Ill. 2d 148, 167-68 (1994). While we view some of the mitigation now being proffered as cumulative to what was presented by counsel at the hearing, some of it was not. The only type of psychiatric testimony adduced on defendant's behalf was the stipulated testimony of Cheryl Winke, who stated that defendant was average in intelligence and was aggressive. The evidence regarding defendant's mental history that he contends was available to counsel and should have been offered in mitigation paints a picture that is at odds with that stipulated testimony.

We also note that the circuit court, in sentencing defendant to death, specifically pointed out that with the exception of Jerry, members of defendant's family had not testified at sentencing despite the fact that the trial took place in Chicago, where they lived. The implication was that defendant's family did not think enough of defendant to testify on his behalf. The affidavits here tend to show that other members of defendant's family were available to testify such that Jerry Wiley, an unwilling witness, need not have provided the only mitigation

voice from the family. We also cannot ignore the fact that Jerry, the only family member whom counsel did compel to testify in mitigation, was found by the court to have been a perfect witness for the State.

In light of these circumstances, we cannot say, as a matter of law, that the outcome of the sentencing hearing would have been the same had the additional pieces of evidence been discovered and presented by trial counsel. We hold that defendant's post-conviction allegations, liberally construed in his favor and taken as true in light of the original trial record, establish a substantial showing of a violation of defendant's right to effective assistance of counsel at the sentencing hearing. The circuit court improperly dismissed this claim without an evidentiary hearing.

## CONCLUSION

The circuit court improperly dismissed defendant's claim of ineffective assistance of trial counsel with respect to counsel's failure to investigate and present evidence in mitigation at the capital sentencing hearing. The circuit court properly dismissed the remaining portions of defendant's petition. Accordingly, the cause is remanded to the circuit court for further proceedings consonant with this opinion.

*Affirmed in part;*
*reversed in part;*
*cause remanded with directions.*

JUSTICE KILBRIDE, concurring in part and dissenting in part:

The majority correctly reverses and remands this cause for a hearing on the issue of the effective assistance of counsel. I concur, therefore, in that narrow portion of the majority's judgment. However, for the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636 (2001) (Kilbride, J., dissenting), and *People v. Simp-*

*son,* 204 Ill. 2d 536, 581 (2001) (Kilbride, J., dissenting), I believe defendant's convictions and sentence should also be set aside because the trial proceedings were conducted without the minimum constitutional assurances established by the new supreme court rules governing capital cases. As a result, this cause should be remanded for a new trial conducted in compliance with the new rules.

Additionally, I share Chief Justice Harrison's belief that the death sentence should not stand for at least one other reason. Specifically, the State initially failed to prove beyond a reasonable doubt that Wiley was guilty of armed robbery. *People v. Wiley,* 165 Ill. 2d 259, 303-05 (1995) (Harrison, J., concurring in part and dissenting in part). Thus, even if defendant were not entitled to the constitutional guarantees established by the new rules, his death sentence should still be vacated because it was solely predicated upon the armed robbery convictions.

CHIEF JUSTICE HARRISON, dissenting:

Whether Wiley's attorney provided effective assistance at the sentencing hearing is not the dispositive issue on this appeal. Regardless of the effectiveness of the lawyer's representation, the proceedings which culminated in Wiley's sentence of death were fatally flawed because they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey,* 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Wiley was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and

the cause should be remanded to the circuit court for a new trial.

Even if Wiley were not entitled to the benefit of the new rules, his sentence of death could not stand no matter what an evidentiary hearing on his post-conviction petition might reveal. That is so for two reasons. First, as I noted when this case was before us on direct review (*People v. Wiley*, 165 Ill. 2d 259, 303-05 (1995) (Harrison, J., concurring in part & dissenting in part)) and as I reiterated in my dissent when we initially considered the appeal from the circuit court's order dismissing Wiley's post-conviction petition, the State failed to prove beyond a reasonable doubt that Wiley was guilty of armed robbery. Because the armed robbery convictions were the sole predicate for Wiley's death sentence, the death sentence is invalid as a matter of law.

Second, for the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Until defendants are permitted to avail themselves of our new rules and until we see how those rules work in practice, there is no basis for altering that conclusion. Wiley's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(j). Because he was convicted of murdering more than one victim, the term of imprisonment must be natural life. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c).

JUSTICE THOMAS, also dissenting:

To prevail on a claim of ineffective assistance of counsel in the context of a death sentencing hearing, a defendant must show prejudice, *i.e.*, that there is a

reasonable probability that absent his counsel's deficient conduct, the court or sentencing jury would have concluded that the balance of aggravating and mitigating evidence did not warrant death. *People v. Hall*, 157 Ill. 2d 324, 337 (1993). I disagree with the majority that defendant in this case made a substantial showing that he was prejudiced by his counsel's deficient conduct at defendant's sentencing hearing. I therefore dissent.

Defendant claimed that his trial counsel failed to discuss any mitigation strategy with him. Defendant further alleged that his trial counsel knew defendant suffered from extreme emotional and mental distress at the time of the offense because defendant's mother was critically ill and his wife recently had left him, taking their infant son with her. Defendant also asserted that his trial counsel failed to contact several family members who would have provided testimony more favorable than that of Jerry Wiley. The evidence submitted by defendant in support of his claim included an affidavit from his daughter, Gwen Brown, stating that Gwen's mother told Gwen that she and defendant got along well, but that defendant often was in and out of jail. Gwen did not have much contact with defendant when she was a baby because defendant was in jail. When defendant was not in jail, he would visit Gwen. Gwen never saw a violent side to defendant. Gwen stated that defendant always was happy, "sometimes too happy." Gwen said that defendant always had a job when he was not in jail. With regard to the illness of defendant's mother, Gwen said that "[w]hen my grandmother got ill, my dad tried to handle it. We talked about it."

Defendant also submitted the affidavits of his sisters, Rosie Rhodes and Juanita Jones. Rhodes stated that she and defendant had different fathers, and that defendant's father used to drink heavily. Rhodes did not know why defendant's father "ended up in an institution." Defen-

dant's mother treated her children well, especially the boys. Defendant got along with his stepfather. Defendant was shot when he was 13 years old, and around that time, his mother found out that he and his friends were breaking into parking meters. Rhodes stated that defendant "pretty much" kept a job, that defendant liked to drink and would get "high" off of drinking, and that she never saw defendant violent. Rhodes said that when their mother became sick with pancreatic cancer, "he [defendant] was hurt ***. [Defendant] pretty much kept his feelings in. Sometimes, he would lay on the bed with her and cry."

Jones testified that she and defendant had the same father and were treated "different" in a small way from their other siblings by their mother and stepfather. Jones also testified that she had a stroke and had difficulty remembering, and that defendant was good to her when she was in the hospital.

Defendant also attached notes from his case file with the Cook County public defender in support of his claim of ineffective assistance of counsel. Included were notes from an interview with defendant's ex-wife, who said that defendant needed psychiatric help because he gets angry when he drinks and is like Jekyll and Hyde. The notes also show that defendant's mother told counsel that defendant's father died in a mental institution. Defendant also submitted the report of Dr. Gunn stating that when defendant "experiences losses (as with his wife and son) he loses control and even conscious awareness of what is taking place. His rage bursts out and his control system fails." Dr. Gunn noted defendant's cocaine and alcohol use, and that defendant reported blackouts and many head injuries, and should be screened for traumatic brain injury.

The evidence in aggravation revealed defendant's criminal history dating back to 1964. In 1964, defendant

was convicted of unlawful use of a weapon and aggravated battery when he was caught shooting at a boy with a sawed-off shotgun. That same year, he also was convicted of attempt robbery. In 1970, defendant served five years' probation for burglary. In 1973, defendant received five years' felony probation for unlawful use of a weapon. In that incident, defendant raised a shotgun, rested it on the roof of an automobile, fired in the direction of a man and shot out a store window. When police officers ordered defendant to put the gun down, defendant refused, but was apprehended when another man crept up behind defendant and grabbed the shotgun.

Defendant next served a sentence of one to four years' imprisonment for a 1976 robbery conviction following his arrest for the armed robbery of a grocery store. In 1978, defendant was convicted of aggravated battery and armed violence and was sentenced to concurrent terms of seven years and five years of imprisonment. That conviction was based upon an incident where defendant hit a 73-year-old woman numerous times on the face with a gun, wrestled the woman to the floor when she tried to get away from him, then put his knee to her chest and started choking her.

Defendant thereafter received a two-year sentence of imprisonment in 1983 for unlawful use of a weapon, following an incident where defendant was found crouched on a street corner with a gun extended in his hand. The murders giving rise to the instant charges occurred in 1985. In addition, while in Cook County jail awaiting trial on the charges in this case, defendant received four disciplinary violations.

Given defendant's extensive criminal history, I do not believe that any of the mitigating evidence offered by defendant would have outweighed the aggravating evidence. This court frequently has refused to find prejudice due to ineffective assistance of counsel in cases

involving violent crimes where a defendant's extensive criminal history was so great that it would have been highly improbable that proposed mitigation evidence would have outweighed the aggravating evidence. See *People v. Jones*, 144 Ill. 2d 242 (1991); *People v. Neal*, 142 Ill. 2d 140 (1990); *People v. Owens*, 129 Ill. 2d 303 (1989).

Here, the testimony of defendant's daughter and sister that they had never seen defendant violent would not have been sufficient to counter defendant's lengthy and violent criminal history. In addition, although the testimony of defendant's family members would have shown that defendant was upset by his mother's illness, their testimony does not establish that defendant suffered an extreme emotional or mental disturbance as a result of her illness. Further, while the report of Dr. Gunn suggests a brain injury, blackouts and a loss of conscious awareness of what is taking place when defendant experiences losses, I note that defendant did not claim that he had no memory of the murders in this case, and in fact was in control of his mental faculties enough to continually change his story to the police when confronted with evidence that he was lying. I further note that defendant also had presented stipulated evidence at his sentencing hearing that Cheryl Winke, a psychologist with the Department of Corrections, would have testified that defendant did not exhibit any psychopathology and appeared to function within the normal range of intelligence. Consequently, I do not believe that Dr. Gunn's report would have been sufficient to overcome the aggravating factors in this case.

I also believe this case is distinguishable from *People v. Orange*, 168 Ill. 2d 138 (1995), and *People v. Thompkins*, 161 Ill. 2d 148 (1994), cited by the majority in support of their finding that defendant was entitled to an evidentiary hearing. 205 Ill. 2d at 235-36, 238. In *Orange*, we noted that the defendant had a limited criminal his-

tory and his prior adjudications had occurred more than 15 years earlier when the defendant was a juvenile. *Orange*, 168 Ill. 2d at 171. The defendant's affiants would have provided testimony concerning defendant's ability to maintain employment over the past 14 years, as well as testimony concerning defendant's violent upbringing, his ability to maintain caring relationships with family members, and his trustworthiness in the eyes of his employers. *Orange*, 168 Ill. 2d at 171. We concluded that it was not unreasonable that such mitigating evidence might have provided the court "with a portrait of the defendant that may have influenced the choice of sentence." *Orange*, 168 Ill. 2d at 171.

Similarly, in *Thompkins*, 161 Ill. 2d at 165, defense counsel argued at defendant's death penalty hearing that defendant should not be sentenced to death because he had not been clearly identified as the gunman. In support of his post-conviction petition, the defendant submitted affidavits from his parents, siblings, children and friends stating that they would have testified on defendant's behalf had they been asked to do so. *Thompkins*, 161 Ill. 2d at 166. This court found that the defendant was entitled to an evidentiary hearing on his claim of ineffective assistance of counsel, noting that the mitigating evidence would have complemented defense counsel's strategy at the defendant's sentencing hearing, and that "[f]avorable testimony by the defendant's family members would have fortified counsel's contention that the evidence of the defendant's role in the offenses was subject to doubt." *Thompkins*, 161 Ill. 2d at 167.

Here, in contrast, there was evidence supporting a finding that the defendant shot the victims, despite his denials. This fact, coupled with defendant's lengthy and violent criminal history, likely would outweigh favorable testimony from defendant's family members. I also am not convinced that the materials submitted by defendant

in mitigation established a mental health history that would have outweighed the aggravating factors. Therefore, I would affirm the trial court's order dismissing defendant's post-conviction petition without an evidentiary hearing.

JUSTICE McMORROW joins in this dissent.