THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLYDE COWLEY, Defendant-Appellant.

First District (6th Division) No. 1—97—3850

Opinion filed November 17, 2000.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Clyde Cowley, was found guilty of the first degree murder of Chicago police officer Daniel Doffyn, attempted murder of Chicago police officer Milan Bubalo, attempted murder of Victor Young, aggravated battery with a firearm of Officer Bubalo and of Young, and possession of a controlled substance with the intent to deliver after a severed but simultaneous jury trial with codefendant Murray Blue. Defendant was sentenced to natural life imprisonment for first degree murder and concurrent lesser sentences for the other offenses. Defendant appeals.

On appeal, defendant contends the circuit court erred in: (1) telling the jury before trial that the death penalty was not a possible sentence; (2) admitting a mannequin wearing the shirt of the victim into evidence and allowing the jury to use the mannequin in the jury room; (3) permitting the prosecutor to argue in closing argument that the murder victim's family needed to "hear" from the jury; (4) failing to properly instruct the jury; and (5) failing to appoint new counsel after defendant alleged ineffective assistance of counsel in a *pro se* motion for a new trial. Defendant further contends the evidence was insufficient for the jury to find him guilty beyond a reasonable doubt of the murder of Officer Doffyn and the attempted murder of Officer Bubalo under an accountability theory, was insufficient to find him guilty of the murder of Officer Doffyn under a felony-murder theory, and was insufficient to find him guilty of possession of a controlled substance with intent to deliver. We reverse and remand for a new trial.

This case involves two shootings at different times and different locations: the shooting of Victor Young (the first shooting), and later the same day, the simultaneous shooting of Officers Doffyn and Bubalo (the second shooting).

Our supreme court has addressed this exact record in *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000), the codefendant with whom this defendant was tried in the same courtroom with the same prosecutors. This statement of facts contains portions of the statement of facts of the supreme court.

At 3:30 p.m. on March 8, 1995, paramedic Schultz answered a "shooting call" at 750 North Lorel in Chicago. There, he found Officer Doffyn in critical condition with a bullet wound to the head. The wound ultimately proved fatal. Defendant, codefendant Murray Blue, and Officer Bubalo had also suffered gunshot wounds, but they survived their injuries.

Five minutes later, Detectives Maher and Salemme arrived at the scene. Detective Maher rode in an ambulance with Murray Blue en route to the hospital and recovered a nine millimeter loaded handgun (TEC-9) and a box of bullets from Blue's pockets. Detective Salemme rode in an ambulance with defendant. Defendant was in stable condition but had feeding and oxygen tubes.

Detective Salemme gave defendant his *Miranda* warnings in the ambulance and defendant indicated he understood them. Defendant then gave an oral statement to Detective Salemme. Defendant said that he was "out south" when Murray Blue and Jimmie Parker pulled up in a black Lincoln Continental and said they were on their way to kill "Puff", a rival drug dealer. Defendant agreed to go with them and act as a lookout. Parker gave defendant a .38-caliber weapon; defendant put it in his pocket. The three men went to Blue's apartment on Lorel Street to get rid of some excess guns in the car. Once inside the apartment, the three men heard police at the front and fled out the back window. Defendant still had the .38-caliber weapon and Blue had two other weapons. As they ran, Blue shot at the police and hit defendant by mistake. This was the totality of defendant's statement in the ambulance.

At the hospital the next day, an assistant State's Attorney (ASA) went to the intensive care unit to question defendant further. Defendant was on pain medication and told the ASA that he was uncomfortable but understood that hospital personnel were doing their best. The ASA questioned defendant intermittently from 2 or 2:30 p.m. until 6 p.m. Defendant communicated and did not fall asleep during questioning. The ASA never inquired whether defendant was tired and did not know whether defendant might have dozed off during periods when the questioning had been interrupted by medical personnel. The ASA did not call defendant's parents before questioning him, although defendant was 16 years old.

Defendant gave a written statement to the ASA at the hospital. Defendant told the ASA that on the afternoon of March 8, 1995, Blue, Parker and Charlie "Chow Mein" pulled up in Blue's Lincoln Continental and told defendant they had to take care of business with Puff, a rival drug dealer infringing on their territory. Blue gave defendant a loaded .38-caliber gun to protect himself and "watch the others' backs." The four men then went to a building at 4300 Maypole to wait for Puff and his workers. They intended to kill Puff or one of his workers to teach them a lesson. Before Puff or any of his workers arrived, Charlie left the building. Shortly thereafter, Parker saw Charlie talking to Victor Young. Young had sold drugs for Blue in the past, but at the time of the incident was selling drugs for someone else and had

been known to stick up Blue's workers. Although Young did not work for Puff, Blue said, "Let's shoot him" and started shooting. As Blue, Parker and defendant left the building to run to Blue's Lincoln Continental, Parker also fired at Young. Defendant still had the .38-caliber gun when they left the scene of this, the first shooting that day.

Defendant also told the ASA that they drove down Lake Street fast because they thought Puff's guys or the police would be looking for them. The plan was to "chill" at Murray Blue's apartment and then continue the plan to kill Puff or one of his workers. Blue let Parker and defendant in the back door of the apartment and told them he had to break the front window because he forgot his keys. Blue and Parker went to the bedroom to stash a couple of extra shotguns under the bed and defendant went to the living room to drink a glass of soda pop. Parker reported that the police had arrived. Upon hearing this, Blue stated, "We're all in this together!" Blue then grabbed the TEC-9 he had just used to shoot Young and followed Parker outside through a window. Defendant, still armed with the .38-caliber weapon, followed Parker and Blue out the window and to the alley. Defendant then heard someone yell, "Police! Stop!" Defendant turned around and ran into a police officer who grabbed him. Blue began shooting and hit the officer and defendant. Both fell.

Defendant suffered two gunshot wounds to the chest and left arm, two to his right arm, and a superficial wound to the left thigh. When questioned about his condition, defendant said he had been treated well by police and paramedics. He had received a pain shot at 11:15 a.m., which he said did not affect his ability to remember and explain the shooting. He said his family knew where he was.

The ASA testified that defendant was not able to sign the statement, summarized by the ASA, because his arm was injured or because medical equipment obstructed use of his arm. Defendant signed with an "X" because "his muscle control wasn't what it obviously would be."

Victor Young testified that, from 1990 until 1991 or 1992, he sold drugs for Blue at a particular corner where Blue controlled drug sales. At the beginning of each day, Blue would give Young two guns to carry with him. Blue would collect the guns at the end of the day. At the time, both Young and Blue were members of the same street gang. Young identified defendant and Jimmie Parker as other people who sold drugs for Blue.

Young stopped selling drugs for Blue when Young joined a rival street gang. In March 1995, Young was selling drugs for the rival street gang.

Young also testified that on March 8, 1995, at approximately 2:30

p.m., Young and some friends were walking when Blue yelled at Young from the first-floor window of an apartment building. Blue accused Young of talking to the police about Blue. Young denied it and told Blue that Blue was not going to harm Young. Young turned to walk away and Blue called after him. When Young turned back toward Blue, he saw Blue holding a TEC-9. Young started to run away and Blue shot at him. Young estimated that Blue fired 12 to 20 shots. Young was hit in the hip or buttocks and fell to the ground.

Young also testified that from the ground, he looked behind him and saw Blue run out of the apartment building, accompanied by defendant and Jimmie Parker. Parker was holding a weapon and, at Blue's direction, also shot at Young. Blue then said, "Let's get out of here. It's getting too hot."

Young saw Blue, Cowley and Parker run through a vacant lot. A few minutes later, Young observed a black Lincoln Continental automobile drive north on Kildare street at 40 miles per hour. Young could not see inside the car, but he knew the car belonged to Blue.

Chicago police officer Jackson testified that she was at the 15th District police station when she heard a report over her police radio of a burglary in progress. Jackson told the dispatcher she could respond to the call, which was across the street from the police station. She and several police officers responded to the call of a burglary in progress at the apartment building.

Officer Jackson also testified that, as she approached the building, she saw Officers Bubalo and Doffyn walking to the front of the building. She entered a gangway at the south side of the building, leading toward its rear. As she reached the far end of the gangway, she was approached by two black males. One carried a TEC-9 with his hands extended in front of him. The other male appeared to be unarmed. Jackson keyed in her radio that she had an emergency, pointed her gun at the men, and yelled at them to get on the ground.

The man with no gun, later identified as Parker, raised his hands in the air but did not immediately go to the ground. The other man turned and started to run away. Eventually, Parker followed Jackson's command to get to the ground. As he did so, Jackson heard gunfire. Jackson remained behind the wall of the gangway, with her gun trained on Parker, until other officers arrived.

Officer Bubalo testified that he and Officer Doffyn were in the parking lot of the police station when they learned of the suspected burglary across the street. They went to investigate the reported burglary and saw broken glass on the ground from a window next to the entrance of the building. Bubalo testified that he went inside the building followed by Doffyn. Bubalo knocked on the front door of the

apartment with the broken window. Bubalo heard the sound of several feet running to the back of the apartment and the sound of breaking glass.

Officer Bubalo further testified that Doffyn ran down the steps from the first-floor landing and out the building. Bubalo followed Doffyn as Doffyn ran from the front of the building to the rear, through a gangway at the north side of the building. When Bubalo entered the gangway, Doffyn was already rounding the far corner of the gangway, into the backyard of the building. According to Bubalo, Doffyn never drew his service weapon at any time.

When Bubalo reached the backyard of the building, he saw Doffyn struggling with a black male. Doffyn had the man, whom Bubalo identified in court as defendant, in a "bear hug" and defendant was trying to break free. Almost immediately, Bubalo heard several gunshots fired in quick succession. Both Doffyn and defendant fell to the ground, with Doffyn lying facedown on top of defendant.

Bubalo testified that, just as Doffyn and defendant dropped, Bubalo felt himself get shot in his left hip. As he fell to the ground, Bubalo saw Blue running toward him, from "around the corner." Blue fired a gun at Bubalo and Bubalo returned fire. Bubalo fired a total of five shots; one struck Blue in the back of the head as Blue ran past Bubalo. This shot caused Blue to fall face forward to the ground, slightly behind Bubalo.

After Blue fell, Bubalo radioed for help, disarmed Blue, and crawled to the aid of Doffyn and defendant. Bubalo underwent surgery the next day for a total replacement of his left hip.

Police officers searched the first-floor apartment with the broken front window. They discovered that the window of the rear door to the apartment had also been broken. Not knowing whether there were other offenders inside, they entered and searched the apartment. No one was inside. In the living room, they found several bags of marijuana on a table and a jacket with .38-caliber bullets in its pocket. In the bedroom, they found plastic bags containing rock cocaine and folded tin packets containing heroin. Also in the bedroom were $5,385 in cash, a scale and a razor blade. An open box of nine-millimeter cartridges lay on the bed. They did not see any mail, receipts, bills or other papers connecting defendant to the apartment. A drinking glass on the living room table had defendant's fingerprint on it.

Richard Chenow, formerly of the firearms section of the Chicago police department, testified as an expert in forensic evidence. Chenow opined, *inter alia*, that the bullet recovered from Doffyn's thigh was fired from the TEC-9 pistol recovered from Blue. The bullet taken from Doffyn's head was so mutilated that it contained insufficient in-

dividual characteristics to indicate, beyond a reasonable doubt, that the bullet had been also fired from the TEC-9. However, Chenow testified that the bullet came from the same class of weapons as a TEC-9.

Chenow stated that the bullet removed from Young also came from the TEC-9 gun, "to the exclusion of all other firearms." As to the bullet removed from Bubalo's body, Chenow could not positively identify it as fired by the TEC-9; however, he could not rule out the TEC-9 as the source of the bullet.

Defense counsel filed a pretrial motion to suppress the statement defendant made to Detective Salemme in the ambulance. Before trial, counsel withdrew the motion. Defendant stated that he consented to counsel's actions when questioned by the court on May 9, 1995. Defense counsel did not file a motion to suppress the statement made by the defendant to the ASA at the hospital.

Following the close of all evidence, during the jury instructions conference, defense counsel made no objection to any of the People's tendered jury instructions and offered no instructions on defendant's behalf.

After the jury returned its verdict, defendant filed a *pro se* motion for a new trial alleging his counsel had been ineffective for failing to file a motion to suppress the statement he had made to the ASA in the hospital. Further, he requested the appointment of separate counsel to pursue this issue in his motion for a new trial. The trial court denied defendant's request for separate counsel. After the trial court denied defendant's request for separate counsel, defendant himself argued that his attorney had failed to call a nurse from the hospital who would have testified that defendant's statement to the ASA was coerced.

The trial court denied defendant's *pro se* motion and found that the motion was based on defendant's unhappiness with the outcome of his trial. The trial court explained that, over one year earlier, defendant had been questioned specifically about his attorney's desire to withdraw the motion to suppress statements, and at that time defendant told the court that he had discussed the matter with his attorneys and was in agreement with their decision to withdraw the motion. The trial court further stated that defendant's attorneys fought very strongly on his behalf throughout the case and that they provided him with "excellent" representation. The trial court also stated that it believed that the evidence against defendant was very strong and that the result would not have been different had the attorneys done what he alleged they failed to do.

Following sentencing and the denial of a motion to reconsider, defendant appealed.

First, and most importantly, defendant and Murray Blue were tried together in the same courtroom, with the same prosecutors, with the same evidence. In *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000), the supreme court found that (1) the prejudicial effect of admitting the mannequin bearing the shirt of Officer Doffyn and allowing it into the jury room outweighed the probative value of the uniform as corroborative evidence of the placement and nature of the officer's injuries; (2) the prosecutor's argument that the officer's family needed to "hear" from the jury was error; (3) the prosecutor's statement to the jury to send a message to all police was error; (4) the prosecutors' "testifying" objections were improper attempts by prosecutors to introduce evidence through themselves; and (5) the cumulative effect of the trial errors deprived defendant of his right to a fair trial.

The supreme court stated:

> "These are not just bloody clothes, but the clothes of a police officer, which, as the defendants noted in *Burrell*, 228 Ill. App. 3d at 144, are uniquely 'charged with emotion.' Critically, too, the jury knew that the stains on the uniform were not only from the officer's blood—a concept disturbing in and of itself—but also from the officer's brains. The latter fact presumably intensified the already inflammatory nature of the garments.
>
> Additionally, the jury was allowed an extended period of exposure to the life-size mannequin that wore the uniform. They saw the mannequin in the courtroom during the testimony of several witnesses, and then were allowed an even closer exposure to the exhibit during their deliberations. By furnishing the jurors with gloves, moreover, the trial court appeared to encourage the jury to engage in a tactile interaction with the uniform.
>
> The nature and presentation of the uniform rendered the exhibit so disturbing that its prejudicial impact outweighed its probative value. Its admission into evidence was error." *Blue*, 189 Ill. 2d at 126, 724 N.E.2d at 934.

Our supreme court reviewed the exact record before us, and we are bound by its findings of error. Murray Blue, however, was alleged to have actually shot the victims while defendant here is charged with murder by accountability.

■ A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1994); *People v. Dennis*, 181 Ill. 2d 87, 96, 692 N.E.2d 325 (1998). To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence which establishes beyond a

reasonable doubt that either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337, 657 N.E.2d 908 (1995); *People v. Stanciel*, 153 Ill. 2d 218, 234-35, 606 N.E.2d 1201 (1992). Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense. *Stanciel*, 153 Ill. 2d at 234.

 █ The common design rule provides that, where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. *People v. Perez*, 189 Ill. 2d 254, 265, 725 N.E.2d 1258, 1264 (2000); *W.C.*, 167 Ill. 2d at 337. Words of agreement are not necessary to establish a common purpose to commit a crime. *People v. Taylor*, 164 Ill. 2d 131, 141, 646 N.E.2d 567 (1995). Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself. *W.C.*, 167 Ill. 2d at 338. Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Taylor*, 164 Ill. 2d at 141. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Taylor*, 164 Ill. 2d at 141.

Mere presence of a defendant at the scene of a crime does not render him accountable for the offense. *People v. Perez*, 189 Ill. 2d at 268; People v. Taylor, 164 Ill. 2d at 140. Presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability. *People v. Taylor*, 186 Ill. 2d 439, 449, 712 N.E.2d 326 (1999); *People v. Shaw*, 186 Ill. 2d 301, 323, 713 N.E.2d 1161 (1998). Accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses. *People v. Perez*, 189 Ill. 2d at 268; *Dennis*, 181 Ill. 2d at 105. Thus, "[u]nless the accomplice *intends* to aid the commission of a crime, no guilt will attach." (Emphasis in original.) *People v. Shaw*, 186 Ill. 2d at 322, 713 N.E.2d at 1173.

Further, in assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing

court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Taylor*, 186 Ill. 2d 439, 445, 712 N.E.2d 326 (1999); *People v. Batchelor*, 171 Ill. 2d 367, 376, 665 N.E.2d 777 (1996).

■ Here, the evidence showed that defendant worked for Blue selling drugs, that he joined with Blue and Parker in helping to protect their drug territory and that he was armed with a weapon when he ran outside with Blue and Parker as they shot at Young at the first shooting. The evidence also established that defendant never separated from Blue and Parker, that they left the area together at a high rate of speed, went to an apartment where they remained together until police arrived, and then tried to escape together when a shootout occurred, killing Officer Doffyn and wounding Officer Bubalo. At all times, the defendant was armed. This evidence of defendant working as a drug dealer, aligning himself with people who wished to protect their drug territory, shooting at Young, fleeing to an apartment full of drugs, fleeing from that apartment with the others when warned of police, being armed throughout these occurrences and of the purpose of all these occurrences, that is, to protect drug territory, combined with the natural and logical inferences, could lead a jury to believe that defendant not only actively participated in the entire series of events but intended to aid others in the commission of all the crimes.

■ Next, defendant claims there was insufficient evidence to prove him guilty beyond a reasonable doubt of felony murder. The jury received accountability instructions for each of the charged offenses, including intentional/knowing murder, and returned a general verdict of guilty. A general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable. *People v. Lymore*, 25 Ill. 2d 305, 307-08, 185 N.E.2d 158 (1962). When a jury returns a general verdict of guilty after being instructed on intentional, knowing and felony murder arising out of a single transaction, the presumption exists that the jury found defendant guilty of the intentional murder. *People v. Thompkins*, 121 Ill. 2d 401, 455, 521 N.E.2d 38 (1988). See also *People v. Shatner*, 174 Ill. 2d 133, 150-51, 673 N.E.2d 258 (1996) (holding that presumption arises when general verdict is supported by indictment establishing that the fact finder at the guilt phase was instructed on all three bases for murder). Where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed to be the most serious offense. *People v. Guest*, 115 Ill. 2d 72, 104, 503 N.E.2d 255 (1986). Here, there was sufficient evidence to support defendant's conviction for intentional murder on an accountability theory. Thus, there is no need to address the issue of felony murder.

Because we find sufficient evidence in the record to support defendant's convictions, there is no double jeopardy bar to a new trial. *People v. Birdsall*, 172 Ill. 2d 464, 480, 670 N.E.2d 700, 708 (1996); *People v. Mink*, 141 Ill. 2d 163, 173-74, 565 N.E.2d 975, 979-80 (1990).

■ Because we reverse in accordance with *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000), we need not consider defendant's remaining contentions of error.

Accordingly, the judgment of the circuit court is reversed and the cause remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

BUCKLEY and ZWICK, JJ., concur.[1]

---

[1]Justice Zwick, who is no longer on this court, sat on the panel for oral arguments in this cause.