2021 IL App (1st) 190892-U

No. 1-19-0892

Order filed January 26, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 6889 |
| | ) | |
| DEMETRI JENNINGS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction of burglary under a theory of accountability is affirmed, where the evidence supported a reasonable inference that defendant acted as a lookout and showed that he assisted the principal offender in removing stolen proceeds from a store.

¶ 2    Following a jury trial, defendant Demetri Jennings was convicted of burglary and sentenced to 10 years' imprisonment.[1] On appeal, defendant argues that the State failed to prove him guilty of burglary under a theory of accountability where the evidence only showed he was involved after the offense was completed. We affirm.

¶ 3    Defendant was charged by information with one count of burglary (720 ILCS 5/19-1(a) (West 2016)), following an incident in Chicago on April 27, 2017.

¶ 4    At trial, Debra Hart testified that she managed a Family Dollar store on the 6300 block of South Cottage Grove Avenue. The store had one public entrance and a back door that opened into the stock room. The store was also equipped with 16 surveillance cameras that recorded 24 hours a day and captured the store's interior and the exterior side of the front and back doors. The Family Dollar's hours in April 2017 were 8 a.m. to 10 p.m.

¶ 5    In the early morning of April 27, 2017, Hart was at home and received a phone call from the company that provided the Family Dollar's security. She went to the store and met with police officers. The store's front window was "busted," and there was a brick and a "little black ***" thing" inside the store near where the window was broken. Hart stated that she did not know defendant, and that defendant was not an employee of Family Dollar in April 2017.

¶ 6    Hart identified photographs entered into evidence, which showed the store's broken front window; the interior and exterior sides of the back door; the brick; the "black thing" Hart saw at

_____

[1] The docketing statement for this case lists defendant's name as "Demetri Jennings A/K/A Dimitri Jennings," while the record alternately spells defendant's first name as "Demetri" and "Dimitri," and the parties choose to spell defendant's first name as "Dimitri." The parties do not dispute that the names "Demetri Jennings" and "Dimitri Jennings" both refer to defendant.

the windowsill, which was half of a broken five-pound weight[2]; the store's laundry detergent aisle with "[a] lot of empty spaces"; and laundry detergent items with Family Dollar sensor tags. The State also entered stipulations that People's Exhibit No. 10 was a flash drive containing surveillance footage from the Family Dollar on the night of the offense, and People's Exhibit No. 11 was a disk containing selected portions of the footage from People's Exhibit No. 10.

¶ 7    On cross-examination, Hart confirmed that the surveillance footage showed one person inside the store placing laundry detergent items into a cart, and a second person outside the store. Additionally, a person wearing a hat could be seen running through the Family Dollar's cooler section. Hart confirmed that Family Dollar recovered some of the laundry detergent items.

¶ 8    Chicago police officer Dimar Vasquez testified that on April 27, 2017, at about 4:02 a.m., he and his partner Officer Evelyn Sykes[3] arrived at the scene. Vasquez drove his marked vehicle to the alley behind the Family Dollar, which was a "very dim" open lot east of the store. With the squad lights off, Vasquez saw defendant exit the back door of the store carrying items in each hand and drop the items by the corner of a dumpster. Defendant wore a dark brown coat, dark jeans, and a rope wrapped around his waistline. Vasquez parked, jumped out of his vehicle, and detained defendant three or four feet from the back door. He then saw that the items dropped by the dumpster were four laundry detergent bottles. Vasquez recovered the detergent and relocated to the front of the store, where he saw a broken side window, half of a broken weight, a shopping

_____

[2] While Hart never identified the "black thing" in the windowsill, other witnesses' testimony and our review of the exhibit shows that the object was half of a five-pound weight.

[3] While Officer Sykes's first name does not appear in transcript of the trial testimony, the transcript elsewhere indicates that Sykes's first name is Evelyn.

cart, laundry detergent, a pizza, and some cookies. He did not see any civilians on the scene other than defendant.

¶ 9    On cross-examination, Vasquez denied that he saw defendant inside the store or saw defendant break the store window, but testified that he saw defendant exit from the back door. Photographs of the scene and evidence were collected, and the stolen goods were inventoried, processed, and returned to the store.

¶ 10    Chicago police detective Ruben Sanchez testified that on April 27, 2017, he Mirandized and interviewed defendant in the presence of his partners Detectives Arturo Mena and Wisniewski.[4] Sanchez asked defendant if he wanted to give a statement, and defendant stated that he did. Defendant stated that a man near the Family Dollar "approached him and told him that he was going to break into the dollar store, grab a shopping cart and load it up with stuff." Defendant only knew this man "from the area." Defendant and the man continued to the Family Dollar, and defendant watched the man break the front window with a round weight and enter the store. Defendant waited outside the storefront for about two minutes and saw three or four police vehicles drive by. "[M]inutes later," the man called defendant to the back of the store. Defendant met with the man, grabbed four detergent bottles from a shopping cart, and fled.

¶ 11    After receiving this statement, Sanchez went to the Family Dollar, assessed the crime scene, and spoke with Hart. Sanchez and Hart reviewed surveillance footage in the Family Dollar's back room. In the footage, Sanchez saw a man outside the store who matched defendant's description.

---

[4] The first name of Detective Mena does not appear in the trial testimony, but is found elsewhere in the transcript, and the first name of Detective Wisniewski is not contained in the record.

¶ 12    On cross-examination, Sanchez confirmed that defendant was arrested around 4 a.m., that the interview occurred at 8:37 a.m., and that it was not recorded or written down. Sanchez also confirmed that the surveillance footage depicted only one person, who was not defendant, inside the store, and that only one individual could be seen leaving the store through the back door. He confirmed that the back door exits into a loading area, which has a fence connected to an alley. There was no door leading directly from the store into the alley. Sanchez searched for the other individual described by defendant but did not apprehend him.

¶ 13    The State published the entirety of the surveillance footage contained on the disk, People's Exhibit No. 11, which we have reviewed. One clip states that it shows the front exterior of the Family Dollar. In this clip, a man wearing a hood is seen pacing up and down a stretch of sidewalk and looking around from 3:55 to 3:59 a.m. Eventually, the man leaves the frame and does not return. Beginning at 4 a.m., police vehicles appear to drive by, and then a police vehicle parks on the sidewalk at 4:02 a.m. Two officers exit the vehicle and walk out of frame.

¶ 14    A second clip states that it depicts the stockroom. In this clip, at 3:55 a.m., a man in a white hat walks through the room, turns around, and walks out of sight. Another clip of the stockroom shows that at 3:59 a.m., the man in the white hat returns with a cart full of items. He takes a box from the stockroom, places it on top of the items in the cart, and then pushes the cart through the back door. On the way through the back door, an item falls out of the cart.

¶ 15    The last clip states that it shows the rear exterior of the store. The camera faces a fence, which has a large gap and is perpendicular to the back side of the store. In this clip, at 3:59 a.m., the man with the white hat comes through the back door and pulls the cart into view. He attempts to pull the cart through the gap in the fence but fails. At 4 a.m., the man wearing a hood appears

and attempts to help the man in the hat lift the cart up and through the gap in the fence. The attempt is unsuccessful, and the two walk out of frame. At 4:01 a.m., the man in the hood approaches carrying objects in his left hand. The man in the white hat follows after him with the cart, stops the cart, and removes items from it. The man in the hood turns around and takes more items from the cart with his right hand. The two then walk through the gap in the fence, leaving the cart behind.

¶ 16    Defendant testified that he did not commit a burglary, and denied that he "conspire[d]" with someone to enter the Family Dollar and take laundry detergent. Rather, he stated that he was walking from a gas station towards a restaurant to get something to eat. He saw "several police coming back and forth" around a Family Dollar store, and a man wearing a tan hat throw a brick through the store's window. Defendant had seen the man twice at a friend's house but had never talked to him. Defendant said nothing and kept walking, and police vehicles continued to drive by. When the man went through the window, defendant was "by the alley." Defendant saw the man with the hat exit from the back of the Family Dollar. The man told defendant to "check it out," asked defendant if he wanted to "make a couple dollars" and to help him pick up laundry detergent bottles, and said "grab what you want." Defendant picked up four laundry detergent bottles and walked towards the end of the alley. Then, a police officer drove up to defendant and exited the vehicle. Defendant "threw" the laundry detergent, told the officer he was walking from the gas station, and was taken to the police station. Defendant denied that he gave a statement at the police station.

¶ 17    On cross-examination, defendant confirmed that he watched the man in the hat break the store window, that the man took items from inside the Family Dollar and called defendant to the back of the store, and that defendant took four detergent bottles and started walking. Defendant

confirmed that he knew that the man in the hat had taken the items from inside the store. Defendant was arrested in the alley about four minutes after he took the bottles. Defendant reiterated that the detective lied about him giving a statement.

¶ 18    The defense entered into evidence a surveillance video clip, which this court has reviewed. This particular clip depicts the man in the white hat taking an item from the freezer section of the store and running down an aisle out of view.

¶ 19    In rebuttal, the State published to the jury that in 2010, defendant received convictions for residential burglary and burglary.

¶ 20    The trial court instructed the jury, in relevant part, that a person is legally responsible for another's conduct when "before or during" an offense, and with "the intent to promote or facilitate" the offense, the person "knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

¶ 21    The jury found defendant guilty of burglary. Defendant filed a posttrial motion, which the trial court denied. Following a hearing, the trial court sentenced defendant to 10 years' imprisonment as a Class X offender, as defendant had multiple convictions for Class 2 felonies.

¶ 22    On appeal, defendant asserts that the State failed to prove him guilty beyond a reasonable doubt of burglary, where the evidence was insufficient to show that he assisted the burglary of the Family Dollar prior to or during its commission. Defendant reasons that the offense of burglary is completed once the offender has entered a premises with the intent to steal, and the evidence showed defendant only assisted the man who broke into the Family Dollar after the man exited the store. The State responds that there was sufficient evidence to support defendant's conviction, as

the evidence showed that defendant was caught with proceeds from the crime, defendant admitted to his participation in the crime, and footage showed defendant's participation.

¶ 23    "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 24    In applying this standard, a reviewing court may not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. "[C]ircumstantial evidence is sufficient to sustain a criminal conviction, so long as the elements of the crime have been proven beyond a reasonable doubt." *People v. Milka*, 211 Ill. 2d 150, 178 (2004). We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 25    Defendant was convicted of burglary on a theory of accountability. Section 19-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/19-1(a) (West 2016)) provides that "[a] person commits burglary when without authority he or she knowingly enters *** a building, *** or any part thereof, with intent to commit therein a felony or theft." The crime of burglary "is complete upon the moment of entry whether or not any theft actually occurs." *People v. Johnson*, 2019 IL 123318, ¶ 34.

¶ 26    Section 5-2(c) of the Code (720 ILCS 5/5-2(c) (West 2016)) provides:

> "A person is legally accountable for the conduct of another when *** either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."

¶ 27    "[A]ccountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses." (Internal quotation marks omitted.) *People v. Klebanowski*, 221 Ill. 2d 538, 552 (2006). Therefore, "[u]nless the accomplice intends to aid the commission of a crime, no guilt will attach." (Emphasis and internal quotation marks omitted.) *People v. Cowley*, 317 Ill. App. 3d 834, 843 (2000) (quoting *People v. Shaw*, 186 Ill. 2d 301, 322 (1998)). "[M]ere presence at the scene, even with knowledge that the crime is being committed," is not sufficient to establish accountability. (Internal quotation marks omitted.) *In re M.W.*, 232 Ill. 2d 408, 437 (2009). "However, active participation has never been a requirement for imposing criminal liability under a theory of accountability," and "one may aid

and abet without actively participating in the overt act." *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). "A person's assistance prior to or during the crime which amounts to accountability may be inferred from conduct which occurs after the event." *People v. Hodge*, 250 Ill. App. 3d 736, 744 (1993). When determining a defendant's guilt based on accountability, "the trier of fact may consider the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene." *Batchelor*, 171 Ill. 2d at 376. Moreover, a defendant may be found guilty by accountability even though the principal offender's identity is unknown. *Cooper*, 194 Ill. 2d at 435.

¶ 28    The State may establish that a defendant intended to promote or facilitate a crime by showing that "either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common-design rule, "if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement." (Internal quotation marks omitted.) *Fernandez*, 2014 IL 115527, ¶ 13. Accountability under the common-design rule "need not be supported by words of agreement" and "may be drawn from the circumstances surrounding the commission of the unlawful conduct." *Cooper*, 194 Ill. 2d at 435.

¶ 29    The evidence at trial overwhelmingly established defendant's guilt of burglary. Namely, the evidence showed that defendant stood outside the front of a Family Dollar while the co-offender broke through the window of the store, stole several items, and exited through the back door. Officer Vasquez saw defendant exit the back door of the store and drop items by a dumpster,

then detained defendant and saw the items were four bottles of laundry detergent. Detective Sanchez testified that at the police station, defendant provided a statement, in which defendant said the co-offender "approached [defendant] and told him that he was going to break into the dollar store, grab a shopping cart and load it up with stuff." Defendant told Sanchez that he subsequently waited outside the store for about two minutes until he was called to the back of the store. While defendant testified that he never gave this statement, it was the role of the trier of fact to determine the credibility of witnesses and resolve conflicting evidence, and we will not reverse the jury's finding that the State's witnesses were more credible. *Williams*, 193 Ill. 2d at 338.

¶ 30    Defendant's statement was further corroborated by video footage from outside the store, in which a man in a hood is seen looking around and pacing outside the store after the window is broken. The man walks out of frame and does not return once an increasing number of police vehicles drive by, and a police vehicle pulls onto the sidewalk. Defendant's statement, combined with the footage, supported a reasonable inference that defendant acted as a lookout as the co-offender completed the burglary. *Batchelor*, 171 Ill. 2d at 377-78 (evidence that the defendant acted as a lookout for a crime was sufficient to support the defendant's convictions based on accountability).

¶ 31    Additionally, the evidence showed that after watching the co-offender break into the Family Dollar, defendant walked to the back of the store and helped move stolen proceeds. Defendant testified that he knew that the items carried by the co-offender had been taken from the Family Dollar, yet he still took some of them. A jury could have reasonably inferred from these facts that defendant's involvement in the burglary was not spontaneous or accidental, and that defendant had agreed to assist in the burglary prior to the co-offender's entry into the store. *People*

*v. Clayborn*, 194 Ill. App. 3d 1079, 1083 (1990) (finding the defendant was accountable for the burglary of a vehicle, where the evidence showed that the defendant "served as the outside man on the burglary," that the defendant "received, without apparent objection, goods which he had to know did not belong to [the principal offender]," and that the principal offender was still inside the vehicle when the defendant received the stolen goods). The jury was not required to "disregard inferences which flow normally from the evidence before it," especially where the evidence showed that defendant was actively involved in the burglary before and during the offense, and continued to assist in moving the proceeds collected by the co-offender. *Jonathon C.B.*, 2011 IL 107750, ¶ 60. We find the evidence at trial was sufficient to prove defendant guilty of burglary.

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 33    Affirmed.