2024 IL App (1st) 231375-U

No. 1-23-1375

Order filed November 20, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 20 CR 6434 |
| | ) | |
| JONAS VILLAFUERTE VEGA, | ) | Honorable |
| | ) | Steven M. Wagner, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Conviction affirmed where the evidence was sufficient to establish that defendant was guilty of second degree murder and did not act with a reasonable belief in the need for self-defense.

¶ 2   Following a bench trial, defendant Jonas Villafuerte Vega was convicted of second degree murder (720 ILCS 5/9-2(a)(2) (West 2020)) and sentenced to 12 years in prison. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he did not act in

self-defense, as the evidence established that his belief that he was in danger of imminent death or great bodily harm was objectively reasonable. We affirm.

¶ 3    Defendant was charged with two counts of first degree murder for stabbing and killing Dionicio Hernandez-Hernandez on June 9, 2020. Count I alleged that defendant intentionally or knowingly stabbed Dionicio and killed him with a knife; count II alleged that defendant stabbed Dionicio multiple times and killed him with a knife, "knowing that such act created a strong probability of death or great bodily harm to Dionicio."[1] 720 ILCS 5/9-1(a)(1), (2) (West 2020). Prior to trial, defendant informed the State that he would raise the affirmative defense of self-defense.

¶ 4    At trial, Magdelena Gonzalez, Dionicio's wife, testified that in June 2020, they were separated and Dionicio lived with his sister, Eneida Hernandez, and her partner, Estevan Barragan, in a trailer in Des Plaines, Illinois.

¶ 5    Eneida testified that on the evening of June 5, 2020, Dionicio arrived home and called her to get Barragan, because a man was there threatening him.

¶ 6    Barragan testified that Eneida told him to go outside to help Dionicio. Barragan looked out a window and noticed Dionicio arguing with a man, whom Barragan identified in court as defendant. Barragan saw Dionicio "put his hands up" and defendant "bowing out," which Barragan demonstrated as pushing his chest out and bowing his elbows to the side. Barragan then walked outside, and defendant walked to his vehicle. On cross-examination, Barragan confirmed that

---

[1] We refer to the victim and his sister Eneida Hernandez by their first names as they share the same last name.

Dionicio and defendant did not get close to each other or physically fight. Barragan did not hear yelling or threats.

¶ 7 Defendant's wife, Miriam Fonseca-Chavez, testified that she had a sexual relationship with Dionicio, her coworker at Magnetic Inspection Lab (MIL) in Elk Grove Village, Illinois. On June 5, 2020, Fonseca-Chavez and Dionicio had a drink after work and then drove separately to get food. When the vehicles were stopped, Dionicio exited his vehicle, approached her vehicle, and told her that he had seen defendant's vehicle. The next day, June 6, Fonseca-Chavez and Dionicio met in a park and made plans to meet the following day. Dionicio did not appear, and later told Fonseca-Chavez that he had seen defendant. On June 9, when Fonseca-Chavez arrived at MIL, she learned that no one had seen Dionicio at work. Fonseca-Chavez and other employees looked for him.

¶ 8 Dionicio's co-worker Paul Wintersteen testified that on June 9, 2020, from the roof of the MIL building, he spotted Dionicio's body in the runoff creek next to the building. Wintersteen approached the creek and observed that Dionicio was unresponsive and half submerged.

¶ 9 A police officer testified that the evidence recovered at the scene included an empty McDonald's coffee cup and lid near the MIL building, red-brown stains determined to be blood on the south side of the building, and a damaged lunch box near Dionicio. In defendant's vehicle, red-brown stains were found throughout, including on the driver's side door grip, armrest, and seatbelt, the center console, various parts of the steering wheel area, and the gear shifter. Defendant's cellphone was recovered at his workplace. A tip of a glove was recovered from Dionicio's mouth, and forensic evidence established that DNA on the glove matched defendant's DNA profile.

¶ 10    Park Ridge police officer David Cacioppo testified that on June 10, 2020, he inspected defendant at the police station and observed a band-aid on defendant's left index finger, abrasions on his knees and left wrist, and small cuts or scratches on his right arm and hand. Defendant did not indicate that he sustained any of those injuries from Dionicio, and denied being injured.

¶ 11    Dr. Ponni Arunkumar, the chief medical examiner for Cook County, testified that Dionicio's autopsy results revealed that he had at least 15 stab wounds on his chest and abdomen, and at least 12 stab wounds on his left back, at an angle, which were consistent with him being in close proximity and on top of the person with the knife. Dionicio's cause of death was multiple sharp force injuries, and he died by homicide.

¶ 12    Elk Grove Village police officer Juan Andrade testified that he assisted Officer Mike Patras as a Spanish interpreter when questioning defendant. The State published People's Exhibit No. 212, a video of the interviews with defendant. As the video, which is included in the record, was shown, Andrade confirmed that he was not translating defendant's statements word-for-word. He did not have any formal training in interpretation.

¶ 13    Patras testified that he interviewed defendant and observed a band-aid on his left index finger, but Patras did not observe other major injuries or bruising on defendant at the time. Patras observed videos of defendant sparring and fight training on defendant's cellphone.

¶ 14    Patras collected surveillance videos from several businesses near MIL, including a McDonald's parking lot and drive through, Brett Anthony Foods, and Highlander Transportation. The State published a compilation video, People's Exhibit No. 258, of the retrieved surveillance videos. The compilation video, which is included in the record and has been viewed by this court, shows defendant's vehicle in the McDonald's parking lot from 4:35 a.m. to 4:44 a.m., and also

shows Dionicio's vehicle at the drive-through at 5:03 a.m. The video then shows defendant's vehicle drive into the Brett Anthony Foods' parking lot, next to MIL. At 5:06 a.m., Dionicio's vehicle pulls into the MIL parking lot. Dionicio exits his vehicle and walks towards the MIL building. About two minutes later, at 5:08 a.m., defendant runs across the MIL parking lot to where Dionicio had just walked. Approximately two minutes later, defendant returns to his vehicle.

¶ 15    On cross-examination, Patras confirmed that during his investigation, he learned that the tip of a glove was found in Dionicio's mouth and defendant had a cut to his index finger. During the interview, defendant denied wearing gloves on the day of the incident. He told Patras that his right hand was in his right shorts pocket "[o]n the knife" when he met Dionicio. As defendant conversed with Dionicio, Dionicio threw hot coffee on defendant, punched him in the face, knocked him to the ground, and they rolled around fighting.

¶ 16    On redirect examination, Patras confirmed that defendant claimed to have thrown the knife into a river and that he did not know how to "fight." Defendant said he scraped his arms and legs when he was arrested. On re-cross examination, Patras confirmed that defendant said one reason he had brought a knife with him was for protection, and he never denied stabbing Dionicio.

¶ 17    Defendant testified that he drove past Fonseca-Chavez's workplace on Friday, June 5, 2020, and saw her and a man (later determined to be Dionicio) standing closely together and talking in the parking lot. He thought it was "weird," so he turned around to go back, and saw Fonseca-Chavez already heading home going in the opposite direction. Defendant saw Dionicio driving behind her. At a stoplight, Dionicio exited his vehicle, approached Fonseca-Chavez's vehicle, and leaned into the driver's side window. Defendant then followed Dionicio to a trailer park. They both exited their vehicles and defendant called to Dionicio, who turned. Defendant

asked Dionicio how Dionicio knew Fonseca-Chavez, and Dionicio replied that they were co-workers. Defendant said she was his wife and to leave her alone. Defendant then returned to his vehicle. Defendant did not ask Fonseca-Chavez about Dionicio.

¶ 18    On June 6, the next day, defendant was suspicious after Fonseca-Chavez left for a run at 8:30 a.m. and did not return until 12 p.m., with her hair and shirt "disheveled." On Sunday, June 7, she went for a morning run "looking very attractive." Defendant followed her to a park and saw Dionicio there. Defendant slept in his vehicle that night, and at around 2 a.m., Fonseca-Chavez called him wondering where he was. Defendant felt "destroyed, distraught, [and] emotionally was in a bad place." He wanted to save his marriage even though he believed Fonseca-Chavez was cheating. Defendant went to work on Monday, and slept in his vehicle on Monday night.

¶ 19    On early Tuesday morning, after almost no sleep, defendant went to MIL to talk to Dionicio. Defendant drove around the area and waited at McDonald's thinking Fonseca-Chavez or Dionicio might be there, but he did not see them. Around sunrise, he went to the building in front of MIL, where he waited in his vehicle until he saw Dionicio arrive. Defendant then exited his vehicle to catch up to Dionicio. When defendant was about three feet away, he called out to Dionicio, who turned, and told Dionicio to leave Fonseca-Chavez alone. Before defendant could say anything else, Dionicio threw a cup of hot coffee at the left side of defendant's face, down his left arm, and punched him on the left side of his face. While Dionicio did so, defendant's right hand was in his shorts pocket holding a folding blade that he had retrieved from the trunk of his vehicle for "protection." Defendant did not punch back. He denied that he was a trained fighter or boxer. Defendant went to a "young man that trains, but it's nothing professional."

¶ 20    After punching defendant, Dionicio launched his whole body towards defendant. They fell to the ground and rolled down a hill. When they stopped rolling, defendant tried to get up using his left hand, as his right hand was in his pocket, but Dionicio got on top of him. Dionicio was "kneeling" on him, "practically sitting," and defendant felt the weight of Dionicio on his waist. Defendant could not breathe and was asphyxiating. Dionicio was punching defendant, biting his finger, and blocking his right hand, which was still in his pocket on the knife. Defendant tried to free his right hand two or three times before he succeeded. When his right hand got free, he drew the knife and "started defending [him]self." Defendant stabbed Dionicio, who was on top of him. He did not know how many times he stabbed Dionicio.

¶ 21    Defendant panicked because he could not breathe and needed his inhaler. Once he moved from under Dionicio, defendant went to his vehicle to get his inhaler. The incident happened "very, very fast." Defendant never intended to stab Dionicio and wanted to "resolve the problem" by talking. He did not call the police because he was "very scared." Defendant was arrested later that same day. He told the police he was not injured because he only felt pain in his finger. Defendant agreed that he told the police he thought he got the marks on the back of his left wrist and hand from being arrested.

¶ 22    On cross-examination, defendant confirmed that he only told the police that Dionicio was on top of him during the altercation, but did not mention he could not breathe and that Dionicio was kneeling over him. Defendant intended to talk to Dionicio and "whatever he said, then scream at him." He never saw Dionicio with a weapon throughout the incident.

¶ 23 After the defense rested, the State called Patras in rebuttal. According to Patras, when defendant was questioned as to whether he expected a physical confrontation with Dionicio, defendant responded, "Si," which Patras interpreted as "Yes."

¶ 24 The court found defendant guilty of two counts of second degree murder. The court commented that "the evidence was not sufficient for an exoneration of the charges but was sufficient to reduce the offense of murder to second degree murder based on the defense of self-defense." Defendant filed a motion for new trial, which was denied. The court merged count II into count I and sentenced defendant to 12 years in prison. The court denied defendant's motion to reconsider his sentence.

¶ 25 On appeal, defendant argues that the court erred in finding him guilty of second degree murder because his belief that he needed to act in self-defense was objectively reasonable, where Dionicio was on top of defendant and defendant could not breathe.

¶ 26 In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). We will not retry the defendant or substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *People v. Gray*, 2017 IL 120958, ¶ 35. A conviction will

not be overturned "unless the evidence is so unreasonable, improbable, or unsatisfactory" that reasonable doubt exists as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 27     To sustain a conviction for first degree murder, the State was required to prove that defendant, without lawful justification, knowingly or intentionally stabbed and killed Dionicio with a knife. 720 ILCS 5/9-1(a) (West 2020). Defendant then had the burden to prove a mitigating factor by a preponderance of the evidence, namely, that he (1) acted under a sudden and intense passion resulting from Dionicio's serious provocation, or (2) believed the circumstances to be such that he was justified in using force in self-defense, but his belief was unreasonable. 720 ILCS 5/9-2(a)(1), (2) (West 2020). The relevant mitigating factor is not an element of the offense, but lessens the culpability and severity of the punishment. *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998).

¶ 28     Once a defendant raises self-defense, the State bears the burden of proving, in addition to the elements of the charged offense, that the defendant's actions were not justified beyond a reasonable doubt. *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. Use of force in self-defense is justified when and to the extent that the defendant reasonably believes that the force is necessary to defend himself or another against another's imminent use of unlawful force. 720 ILCS 5/7-1(a) (West 2020). "However, [a defendant] is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." *Id.*

¶ 29     The elements of self-defense that a defendant must establish are: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm

was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 95. If the State negates any of these six elements, the defendant's self-defense claim fails. *Id*.

¶ 30    Self-defense raises a question of fact for the trier of fact to determine. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 33. The trier of fact is not required to believe the defendant's version of events, and may consider other factors and circumstances, including the relevant testimony of other witnesses, which may contradict his story or raise serious questions about its probability. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004).

¶ 31    Here, defendant acknowledges that he fatally stabbed Dionicio. The contested issue is the sixth element of self-defense, addressing the reasonableness of defendant's belief that the circumstances warranted his use of deadly force to defend himself against Dionicio. Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to prove beyond a reasonable doubt that defendant's belief that deadly force was necessary against Dionicio was objectively unreasonable.

¶ 32    Defendant testified that he initially approached Dionicio to confront Dionicio about Fonseca-Chavez. Defendant kept one hand on an open knife in his pocket. According to defendant, Dionicio threw the cup of hot coffee on him, punched him in the face, and knocked him down, which sent them rolling down a hill. Dionicio then got on top of defendant and pressed his knees on his waist. Defendant could not breathe and needed his inhaler. Defendant then freed his hand and stabbed Dionicio, but did not know how many times.

¶ 33    Viewed as a whole, the evidence was sufficient to establish that defendant's belief that the circumstances justified his use of deadly force by repeatedly stabbing Dionicio with a knife was objectively unreasonable. Defendant's prior confrontation with Dionicio about Fonseca-Chavez had not become aggressive or physical, and he had not seen Dionicio with a weapon. Although defendant indicated that when the struggle at issue began, his right hand was essentially trapped in his shorts pocket, once his hand was free, his immediate action was to stab Dionicio least 15 times on his chest and abdomen and cause at least 12 stab wounds on his back. Defendant made no attempt to move away from Dionicio in a less lethal way. Also, defendant told police he was not injured during the incident.

¶ 34    When reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant did not act with an objectively reasonable belief in the need for self-defense when he stabbed Dionicio with a knife nearly 30 times. Although defendant maintains that his subjective belief that he was asphyxiating necessarily means that the force he used in response was reasonable, the trier of fact was not required to believe defendant's version of events and could consider other factors casting doubt on its probability. *Young*, 347 Ill. App. 3d at 920. Moreover, "[w]here a defendant's statement is contradicted by the facts and circumstantial evidence, the trier of fact need not believe it, even though other witnesses do not contradict the statement directly." *People v. Batchelor*, 171 Ill. 2d 367, 376-77 (1996). Considering defendant's testimony alongside the injuries he inflicted on Dionicio, the factfinder could conclude that defendant's belief in the need for the force he used was objectively unreasonable.

¶ 35    Accordingly, the State proved beyond a reasonable doubt that defendant did not act in self-defense and we affirm the second degree murder conviction.

¶ 36    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 37    Affirmed.